IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

JOANN GARCIA,

      Plaintiff,

vs.                                          Civil No. 04-1058 WJ/RLP

MONARCH DENTAL CORPORATION, and
BRIGHT NOW! DENTAL, INC., and
RAFAT MANSOUR,

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANTS' MONARCH AND BRIGHT NOW!'S MOTION FOR SUMMARY JUDGMENT AND REMANDING STATE LAW CLAIMS TO STATE COURT

THIS MATTER comes before the Court pursuant to Defendant Monarch Dental Corporation and Bright Now! Dental, Inc.'s Motion for Summary Judgment (Doc. 59). Having reviewed the submissions of the parties and being fully advised on the law, I find Defendants' motion will be granted in part to the extent it seeks dismissal of Plaintiff's federal claim. Having dismissed Plaintiff's federal claim, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims, and these claims will be remanded to the state court from which they were removed.

**BACKGROUND**

Plaintiff Joann Garcia filed her complaint in this matter against Defendants alleging Title VII violations and tortious conduct under New Mexico state law. Defendants Monarch Dental

Corporation (Monarch) and Bright Now! Dental, Inc. (Bright Now!) are referred to in the Complaint as "Corporate Defendants."  With regard to these Defendants, the Complaint alleges in Count One that they violated Title VII by creating a hostile work environment and by engaging in quid pro quo sexual harassment.  Plaintiff alleges in this count that she suffered tangible employment actions.  In Count Two, Plaintiff alleges that the Corporate Defendants are liable for intentional infliction of emotional distress because they engaged in conduct that was intentional, outrageous and in reckless disregard of the near certainty that the conduct would cause Plaintiff distress, and that the conduct did cause Plaintiff severe emotional distress.  Plaintiff alleges in Count Three that the Corporate Defendants engaged in negligent infliction of emotional distress because the negligent acts of these Defendants inflicted emotional distress on Plaintiff.  Count Four alleges that the Corporate Defendants are liable to Plaintiff for wrongful termination because Defendants constructively discharged Plaintiff in violation of public policy and in breach of an employment contract.  Plaintiff alleges in Count Seven that the Corporate Defendants are liable for negligent retention because they negligently retained Defendant Mansour in their employ after they knew or should have known of his conduct.

Monarch and Bright Now! filed the instant motion for summary judgment arguing they are entitled to judgment with regard to all of Plaintiff's claims.  Viewing the evidence in a light most favorable to Plaintiff as the Court must in deciding a motion for summary judgment, the pertinent facts may be summarized as follows.

Plaintiff was hired on July 22, 1996 as a Front Desk Receptionist by Sunshine Dental Care.  Plaintiff's employment was "at-will," and she signed a document acknowledging this

shortly after she was hired and again in June 2001.[1]  She was later promoted to Office Manager

and also served as Regional Manager for some time.  Monarch Dental Corporation (Monarch)

took over Sunshine in approximately 2000 or 2001.  Plaintiff was subsequently demoted back to

Office Manager in approximately 2001.  As Office Manager, Plaintiff was responsible for a

smooth-running office, the supervision of employees and assurance of patient satisfaction.  The

Regional Manager was in charge of four dental offices and assured that every office met

production and collection goals and was responsible for training employees.  Plaintiff was

supervised by Janace Verlie, Monarch's Regional Manager for the southwest area.

Defendant Rafat Mansour is a dentist and, at all times material to this case, was employed

by Modern Dental Professionals-New Mexico, P.C.  Dr. Mansour was assigned to work at a

Monarch Dental Associates location - the same location at which Plaintiff was employed.  Dr.

Mansour was not responsible for Plaintiff's supervision.[2]  While Dr. Mansour could contact

Plaintiff's supervisor with any concerns about Plaintiff's work performance, he had no authority

to hire or fire Plaintiff.  Dr. Mansour never threatened to terminate Plaintiff and never gave any

indication that he had the authority to do so.  Dr. Mansour was not technically employed by

Monarch, but was assigned to them as an independent contractor.[3]

---

[1]Plaintiff's response disputes this fact, but offers no evidentiary support to counter
Defendants' evidence that Plaintiff's employment was "at-will."  The Court must view the
**evidence**, as opposed to unsupported factual allegations, in a light most favorable to Plaintiff.

[2]While Plaintiff's response indicates that she disputes this fact and all others put forth by
Defendants suggesting that Mansour had no supervisory authority over her, she provides no
evidentiary support to counter Defendants' evidence that Dr. Mansour had no such authority.

[3]Again, Plaintiff disputes this fact but offers no evidentiary support for her contention that
Dr. Mansour was employed by Monarch.  In any event, the materiality of this fact to the current
litigation has not been made clear to the Court.

3

On February 22, 2001, Plaintiff acknowledged receipt of Monarch's Policy against Harassment and understood that Monarch strictly prohibited discrimination, harassment, and retaliation based on gender and other protected categories.  She also agreed, at that time, to report conduct that might be in violation of the policy and to cooperate with any investigation. Once again, on May 7, 2001, Plaintiff was reminded that Monarch would not tolerate harassment of its employees.  Plaintiff acknowledged her understanding of the policy and agreed to report any possible violation of the policy.  Monarch's policy against harassment made clear that no supervisor or professional service provider had the authority to suggest to any employee that his or her continued employment or further advancement would be affected in any way by the employee's entering into or refusing to enter into any form of personal relationship with that individual.  Monarch's policy stressed the importance of communicating any complaint or concern so that the company could address those issues.

Monarch provided a toll-free Corporate Human Resources Hot Line number and encouraged its employees to use the number to discuss any harassment they perceived. Employees were also asked to use the Hot Line number to report dissatisfaction with the way a complaint had been handled.  Plaintiff received the Network 800-Hotline informational packet regarding this hotline on August 19, 2002 and acknowledged her understanding that she should report violations through management, but could use the hotline as an alternative if she preferred. On February 11, 2003, Plaintiff received a copy of the Human Resources Procedures and Guidelines Manual and attended a training session presented by the Human Resources Department.

On or about March 18, 2004, Plaintiff telephoned her supervisor, Janace Verlei, from the hospital and told Ms. Verlei she was in for a bleeding ulcer that she hoped would heal without surgery.  She also stated that she would be seeing a psychiatrist.  During this call, Plaintiff reported that, approximately five to seven days previously, she had been in Dr. Mansour's office discussing a patient,[4] and Dr. Mansour commented that she looked good.  When Plaintiff got up to leave his office, Dr. Mansour stood up, got between Plaintiff and the door, then locked the door.  He said he wanted to touch her breasts because he had never touched breasts with implants.  He then pushed her against a wall, kissed her and stuck his tongue in her mouth, and reached under her shirt inside her bra touching her breasts.  Plaintiff turned her face and said she had to return to her desk.  Dr. Mansour then let her leave his office.  Plaintiff complained that Dr. Mansour had been coming onto her and frequently hung around her desk.  She stated that he had shared a dream with her about engaging in sexual acts with her and that she had overheard Dr. Mansour talking "nasty" to another employee.  Plaintiff claimed that Dr. Mansour yelled at her and, as a result, she had been hesitant to complain earlier.

In addition to these specific complaints reported in March 2004, Plaintiff claims that Dr. Mansour described dreams to her in which he dreamed of specific sexual positions with her, dreamed of her breasts, dreamed of "doing 69" with her and described waking up with her.  In January or February 2004, Dr. Mansour asked Plaintiff if she had ever "had it in the butt."  On approximately five occasions, he asked Plaintiff if she had ever been spanked and if she liked being spanked.  Prior to the incident in his office, Dr. Mansour had attempted to kiss Plaintiff on several

---

[4]Plaintiff testified that she often went into Dr. Mansour's office for closed door meetings regarding patients or staff issues.

occasions but had never succeeded.  He had attempted to feel her breasts by massaging her shoulders and gradually moving his hands toward her chest, but Plaintiff had always moved before he had reached her breasts.  Dr. Mansour sometimes stood behind Plaintiff's chair and whispered in her ear while rubbing his crotch against her shoulder.  Dr. Mansour suggested that Plaintiff's husband was probably having an affair and suggested that Plaintiff would find Dr. Mansour more satisfying than her husband.  On a couple of occasions in 2003, Dr. Mansour suggested that Plaintiff come to his house and cook for him while naked.  Dr. Mansour made lewd or derogatory comments and jokes on an almost daily basis in front of all the staff.  Plaintiff witnessed Dr. Mansour massage the shoulders of another employee, Sheila Self, put his hands down her shirt, and pinch and grab her butt.  Ms. Self did not object, but Plaintiff told Dr. Mansour to "knock it off" and the behavior stopped.

According to Plaintiff, Dr. Mansour began sexually harassing her in early 2003.  The harassment was initially subtle in that Dr. Mansour would just get in closer than normal proximity to Plaintiff.  The harassment got worse after Plaintiff's father died.[5]  According to Plaintiff, her hospitalization in March 2004 was precipitated by thoughts of having to return to work the following Monday and face Dr. Mansour.  Although Plaintiff alleges that she was sexually harassed by Dr. Mansour beginning in early 2003, she did not complain of or report any violation of the harassment policy until March 2004 when she called Ms. Verlei from the hospital.

---

[5]Dr. Mansour admitted in his deposition to nearly all of the conduct that Plaintiff alleges including asking her to have anal sex with him and attempting to grab her breasts.  However, Dr. Mansour contends that much of the time he was joking.  He also alleges that he and Plaintiff had a consensual sexual relationship and engaged in sexual intercourse in his office on two occasions. Plaintiff denies having a consensual sexual relationship with Dr. Mansour.  It is not clear from the record whether Dr. Mansour admitted this conduct prior to his deposition and whether Monarch was aware of the conduct prior to the deposition.

Although Plaintiff alleges that Monarch had knowledge that Dr. Mansour had engaged in sexual harassment of staff prior to her March 2004 report, Plaintiff bears the burden at this stage of producing some evidence from which such prior knowledge may be inferred, and Plaintiff has produced no such evidence.  Thus I find, for purposes of this motion, that Monarch had no prior knowledge of Dr. Mansour's alleged sexual harassment prior to Plaintiff's report to Ms. Verlei.

After receiving Plaintiff's complaint, Ms. Verlei immediately reported Plaintiff's concerns to Paula Foster, Human Resources Manager, and Ms. Foster immediately investigated Plaintiff's complaint.  Ms. Verlei had no further contact with Plaintiff after she received Plaintiff's call from the hospital.  Ms. Foster spoke with Plaintiff by phone regarding her complaint and also interviewed Dr. Mansour and others including Sheila Self and other staff persons working in the office with Plaintiff and Dr. Mansour.  During the investigation, nobody at Monarch kept in contact with Plaintiff regarding the ongoing investigation, and Plaintiff's only contact with anyone at Monarch was by telephone.

Ms. Foster and Dr. Barnes traveled to New Mexico to deliver a Notice of Corrective Action to Dr. Mansour dated March 23, 2004.  The Notice advised Dr. Mansour that an investigation had been conducted, and that the results of the investigation confirmed that Dr. Mansour had

> participated in unlawful harassment on multiple occasions including:
> - Physical conduct such as unwanted touching and blocking normal movement
> - Making derogatory jokes and comments
> - Making unwanted sexual advances

Defendants' Exhibit K.  The Notice also stated that Dr. Mansour's conduct had created a threatening and hostile work environment for the staff and that his actions violated Bright Now!

and Monarch's Unlawful Harassment Policy.  Dr. Mansour was warned that any further violation

would result in immediate termination and that he was not permitted to retaliate against any staff

person for reporting the harassment.  Dr. Mansour was not terminated for his conduct, was not

transferred to another office, and received no other discipline during his business relationship with

Monarch.[6]  Monarch received no further complaints from any employee regarding Dr. Mansour's

conduct after March 2004.

Only after Ms. Verlei and Dr. Barnes delivered the Notice to Dr. Mansour did anyone at

Monarch contact Plaintiff to notify her of the status of her complaint.  Ms. Foster informed

Plaintiff that Dr. Mansour had been warned but would not be fired or transferred from the office

in which they both worked.  She informed Plaintiff that she had used all of her sick and vacation

leave and would not receive pay for any additional time off.  Ms. Foster then stated that she

would need to know by the end of the week when Plaintiff would be returning to work.  Plaintiff

told Ms. Foster that she needed time to decide and would need to discuss it with her husband.

She then asked Ms. Foster what Ms. Foster would do if placed in the same circumstances.  Ms.

Foster responded that Dr. Mansour had promised that he would provide a safe place for Plaintiff

to return and that Ms. Foster would just put her chin up and go back to work.

On March 29, 2004, Plaintiff called Ms. Verlei and informed her that she was resigning.

Plaintiff does not recall the exact date on which her pay stopped, but testified at her deposition

---

[6]Dr. Mansour did leave Monarch recently to start his own practice.

8

that her pay stopped prior to her resignation.[7]  Plaintiff was dissatisfied with Monarch's response to their investigation and believes that Dr. Mansour should have been fired.

In her deposition, Plaintiff answered "yes" when questioned about whether she had done a good job for Monarch, whether she had stayed on top of things at the office, whether she did everything asked of her by Monarch, whether she was able to get all of her work done, and whether she felt she had been there for the other employees at the office.  Defendants offer this testimony as evidence that Plaintiff ability to work effectively was not affected by Dr. Mansour's conduct, but the testimony is susceptible of other interpretations, and Plaintiff disputes Defendants' interpretation.  Therefore, the Court cannot find for purposes of this motion that Plaintiff's ability to perform her job was unaffected by Dr. Mansour's conduct.

Plaintiff made clear to Dr. Mansour during the time that he was sexually harassing her that his conduct was unwelcome.  As a result of the sexual harassment, Plaintiff was hospitalized at Memorial Hospital for a week where she received medication and psychological counseling.  Her parenting was affected, she could barely get out of bed, and her marriage suffered strain.

---

[7]Defendants contend that Plaintiff did not give Monarch an opportunity to provide a workplace free from harassment because she never returned to work and did not express a desire to return to work under alternative circumstances such as working at a different location. Defendants further urge that, if Plaintiff had proposed a return to work at a different location, Defendants would have considered alternative options.  While the evidence does show that Plaintiff resigned rather than return to work in the office with Dr. Mansour, that evidence is equally susceptible of an interpretation that Defendants failed to consider whether Plaintiff's return to work with Dr. Mansour was feasible and made no offer to consider alternative circumstances for her return.  Thus, the Court will not adopt Defendants' version as an undisputed material fact for purposes of this motion.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In ruling on a motion for summary judgment, a Court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998).  In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party.  Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228.

**DISCUSSION**

I.     PLAINTIFF'S CLAIMS IN COUNT ONE UNDER TITLE VII

Courts have interpreted Title VII to prohibit two types of sexual harassment:  quid pro quo sexual harassment and hostile work environment sexual harassment.  Hirschfeld v. N.M.

Corrections Dep't, 916 F.2d 572, 757 (10th Cir. 1990).  Quid pro quo sexual harassment involves

a conditioning of tangible employment benefits upon the submission to sexual conduct.  Hicks v

Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  Hostile work environment harassment

occurs "where [sexual] conduct has the purpose or effect of unreasonably interfering with an

individual's work performance or creating an intimidating hostile or offensive working

environment." Meritor Sav. Bank, 477 U.S. at 65.  The Supreme Court has noted that the terms

"quid pro quo" sexual harassment and "hostile work environment" sexual harassment are not

present in the statutory language of Title VII.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742,

752 (1998).    The term "quid pro quo" is useful to distinguish cases in which a supervisor

demands sexual favors in exchange for a job benefit and carries out the threat from cases in which

a threat is not carried out.  Id. at 753.  When a plaintiff proves that a tangible employment action

is the result of a refusal to submit to sexual demands, she has established an action under Title

VII.  Id. at 753-54.  However, where a claim involves only unfulfilled threats, it is properly

characterized as a hostile work environment claim.  Id. at 754.

     A.     Hostile Work Environment Sexual Harassment

Title VII forbids actions taken on the basis of sex that "discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment." Faragher v.

Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)).  Hostile work

environment harassment occurs when unwelcome sexual conduct "'unreasonably interfer[es] with

an individual's work performance or creat[es] an intimidating, hostile, or offensive working

environment.'"  Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408, 1412 (10th Cir.

1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); 29 C.F.R. S

1604.11(a)(3).  <u>Meritor</u> states that "[f]or sexual harassment to be actionable, it must be
sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an
abusive working environment.'"  477 U.S. at 67 (citation omitted).  The harassing conduct must
be "both objectively and subjectively abusive."  <u>Turnbull v. Topeka State Hospital</u>, 255 F.3d
1238, 1243 (10th Cir. 2001). There is no "mathematically precise test" for determining whether
conduct is sufficiently severe or pervasive.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 22 (1993).
Some factors to be weighed include "the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance."  <u>Id.</u> at 23.

        The Tenth Circuit has stated that, "Our precedents, however, eschew ... a mechanical
approach to analyzing hostile work environment claims."  <u>Penry v. Federal Home Loan Bank of</u>
<u>Topeka</u>, 155 F.3d 1257, 1261 (10th Cir. 1998).  In  <u>Meritor</u>, the Supreme Court stated that the
existence of sexual harassment must be determined "in light of the record as a whole," and the
trier of fact must examine the totality of the circumstances, including "the context in which the
alleged incidents occurred."  477 U.S. at 69 (quoting 29 C.F.R. S 1604.11(b) (1985)) (internal
quotation marks omitted).  Indeed, the very term "environment" indicates that allegedly
discriminatory incidents should not be examined in isolation.  <u>Penry</u>, 155 F.3d at 1261.  Thus, this
Court must examine the totality of the circumstances in reviewing the summary judgment motion
with regard to a hostile work environment claim.  <u>See</u>, <u>Davis v. U.S. Postal Svc.</u>,142 F.3d 1334,
1341 (10th Cir. 1998); <u>Smith</u>, 129 F.3d at 1413.

        If a plaintiff establishes that she suffered actionable harassment, the Court must consider
whether the employer may be held liable for the alleged harassment.  When a plaintiff alleges

sexual harassment by a co-worker, the only basis for employer liability is under a negligence theory. Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998). When a plaintiff alleges sexual harassment by a supervisor, the employer is vicariously liable subject to an affirmative defense. Faragher v. City of Boca Raton, 524 U.S. 775, 780 (1998).

Corporate Defendants argue that they are entitled to summary judgment on Plaintiff's claim of hostile work environment sexual harassment because the conduct complained of was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. On this point, Defendants urge that Plaintiff was able to effectively fulfill her duties in spite of Mansour's alleged conduct so has failed to show an alteration in the terms and conditions of her employment. Defendants also urge they are entitled to judgment on Plaintiff's hostile environment claim because Monarch responded appropriately and promptly to Plaintiff's complaint when it was made aware of her concerns.

       1.      <u>Has Plaintiff Shown an Actionable Hotile Environment Claim Because the Conduct She Complains of was Sufficiently Severe and Pervasive to Alter the Terms and Conditions of her Employment?</u>

In arguing that Plaintiff has not shown sufficiently severe or pervasive harassment to have an actionable hostile environment claim, Defendants characterize the harassment as a single incident of touching, a few incidents in which Mansour stood too close to Plaintiff, some "nasty talk" and comments that Plaintiff overheard. Defendants compare the facts in this case to those in Gross v. Burgraff Constr., 53 F.3d 1531 (10th Cir. 1995) and Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257 (10th Cir. 1998). In Gross, the plaintiff alleged that she was harassed by her supervisor and co-workers through use of profanity, yelling, and various threats. The Tenth Circuit held that the conduct alleged was not sufficiently severe or pervasive to alter the plaintiff's

working conditions.  53 F.3d at 1547-48.  Penry, the plaintiffs alleged that their supervisor made a

variety of inappropriate comments to them over a period of three years.  They also alleged that he

"needlessly touched them on many occasions . . ." and would often "sneak up from behind and

grab [their] shoulders . . .."  155 F.3d at 1261.  The Tenth Circuit held that the vast majority of

the conduct complained of was not motivated by the plaintiffs' gender so any hostile work

environment was based on gender neutral incidents and could not support a Title VII claim.

Both Penry and Gross are easily distinguished from this case.  Gross did not involve any

allegations of sexual assault or touching of any kind.  While Penry involved some touching, the

touching was not overtly sexual in nature.  Plaintiff in this case alleges that, in addition to ongoing

conduct and comments, the alleged harassing conduct by Mansour culminated in an incident in

which Plaintiff was trapped, grabbed, kissed, and had her breasts fondled beneath her clothes.

Based on the evidence provided in this case, a reasonable fact finder could easily view the

harassment much differently that it was characterized by the Defendants and could easily conclude

that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule and insult

sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an

abusive working environment.  See Penry, 155 F.3d at 1261.

Defendants also assert that Plaintiff's evidence does not show that Plaintiff subjectively

perceived the conduct as offensive because Plaintiff testified that she was able to perform her job

in spite of the harassment and because the alleged harassment occurred for a period of a year

before Plaintiff reported it.  Defendants infer from Plaintiff's testimony that Mansour's conduct

did not alter the terms and conditions of Plaintiff's employment.  As I noted in relating the facts of

this case, Plaintiff's testimony that she continued to perform her job well in spite of Mansour's

alleged conduct is susceptible of an inference other than the one given by Defendants. Simply because an employee continues to perform his or her job and even performs it well does not mean that harassing conduct has not altered the conditions of employment or that the employee did not find the conduct offensive. A defendant is certainly entitled to argue this to a fact finder, but a rational fact finder could conclude that the employee's performance remained acceptable at some cost or effort because of changes in conditions of employment.

In accordance with the above, I conclude that the conduct of which Plaintiff complained was sufficiently severe and pervasive to be actionable under Title VII.

2.   Has Plaintiff Shown that the Employer may be Held Liable for the Alleged Harassment?

Plaintiff appears to allege that Mansour was her supervisor and that the Corporate Defendants are vicariously liable for his conduct in accordance with Faragher and Ellerth. Plaintiff also appears to allege that she suffered a tangible employment action. If there was evidentiary support to characterize Mansour as Plaintiff's supervisor, Defendants would be vicariously liable unless they could prove an affirmative defense by showing (1) that they exercised reasonable care to prevent and correct promptly and sexually harassing behavior; and (2) that the Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. Faragher, 524 U.S. at 807. This affirmative defense would not be available to them if Plaintiff suffered a tangible employment action at the hands of Mansour. Ellerth, 524 U.S. at 766.

For purposes of Plaintiff's hostile environment claim, the Court need not determine whether Plaintiff was constructively discharged or whether such alleged constructive discharge is

a tangible employment action precluding Defendants from asserting the <u>Faragher</u>/<u>Ellerth</u>

affirmative defense because there is no evidence to support the characterization of Defendant

Mansour as Plaintiff's supervisor. "An individual qualifies as an 'employer' under Title VII if he or

she serves in a supervisory position and exercises significant control over the plaintiff's hiring,

firing or conditions of employment." <u>Sauers v. Salt Lake County</u>, 1 F.3d 1122, 1125 (10th

Cir.1993). The evidence shows clearly that Mansour did not serve in a supervisory position over

Plaintiff and had no authority over Plaintiff's conditions of employment and had no authority to

hire, fire or discipline Plaintiff. The evidence also clearly shows that Plaintiff was fully aware that

Mansour had no authority over her. Plaintiff offers no evidence to refute Defendants' evidence

that Mansour was not Plaintiff's supervisor. Accordingly, Corporate Defendants are not liable for

Mansour's allegedly harassing conduct unless Plaintiff offers evidence that Corporate Defendants

were negligent. <u>See</u> <u>Lockard</u>, 162 F.3d at 1074.

       Employers may be held liable under a negligence theory if they fail to remedy or prevent a

hostile or offensive work environment of which management-level employees knew, or in the

exercise of reasonable care should have known. <u>Id.</u> In this case, Plaintiff did not complain of the

sexual harassment until after Mansour allegedly trapped her in his office and kissed and fondled

her. She does not allege that Mansour engaged in any harassment after she complained. While

Plaintiff alleges that Monarch had knowledge that Dr. Mansour had engaged in sexual harassment

of staff prior to her March 2004 report, she offers no evidentiary support for this assertion.

Accordingly, there is no evidence from which a reasonable jury could infer that Corporate

Defendants through any management-level employee knew or should of known of the hostile or

offensive work environment to which Plaintiff was exposed prior to her March 2004 report, and

there is no evidence she was subjected to any further offensive conduct by Mansour or anyone else after her report.  Thus, she cannot show that Corporate Defendants are liable for Mansour's conduct under a negligence theory.

Plaintiff appears to argue that the Corporate Defendants' investigation and resulting corrective action were unreasonable and that she may bring her Title VII claim on this basis. However, there is no separate claim under Title VII for unreasonable investigation or unreasonable corrective action.  Rather, a Plaintiff under Title VII may show employer liability for sexual harassment by showing that she was harassed because an employer negligently allowed the harassment after she reported the harassment.  See Scarberry v. ExxonMobile Oil Corp., 328 F.3d 1255 (10th Cir. 2003).  Because Plaintiff never returned to work after reporting the alleged sexual harassment by Mansour, the investigation and corrective action by Corporate Defendants could not have caused or permitted the harassment even if it was unreasonable.[8]

Because Plaintiff cannot show that the Corporate Defendants are liable for Mansour's alleged conduct in creating a sexually hostile work environment, these Defendants are entitled to summary judgment with regard to Plaintiff's Title VII claim for hostile work environment sexual harassment.

B.      Quid Pro Quo Sexual Harassment

When a plaintiff proves that a tangible employment action is the result of a refusal to submit to sexual demands by a supervisor, she has established an action under Title VII.  Ellerth, 524 U.S. 742, 753-54.  As the Supreme Court noted, a "quid pro quo" claim, as opposed to a

---

[8]The Court does not here decide whether the investigation and corrective action were unreasonable but merely states that, even if it was unreasonable, it did not result in or permit any further harassment.

hostile environment claim, is one in which a supervisor demands sexual favors in exchange for a

job benefit and carries out the threat.  Id. at 753.  By necessary inference, a quid pro quo claim

will not lie when the person allegedly demanding sexual favors had no authority to condition any

tangible employment benefit on submission to that demand.  Stated another way, even assuming a

Plaintiff suffers some tangible employment action, if that tangible employment action is not the

result of the Plaintiff's response to a supervisor's demand for sexual favors, she has no claim for

quid pro quo sexual harassment.

      Plaintiff's complaint alleges that she was subjected to quid pro quo sexual harassment and

suffered a tangible employment action.  Defendants argue that Plaintiff cannot show a tangible

employment action because she resigned from her employment.  They also contend that her

alleged constructive discharge was not the result of Mansour's harassing conduct.

      The law in the Tenth Circuit and in other circuits is unclear whether constructive discharge

is considered a tangible employment action under Burlington.[9]  Assuming *arguendo* that it is a

--------

      [9] See, Mallinson-Montague v. Pocrnick et al, 224 F.3d 1224 (10th Cir. 2000) (tangible employment action does not need to be severe enough to constitute constructive discharge, but noting that it would be "unwise to merge the Supreme Court's specific language in Faragher and Burlington into the general umbrella concept of constructive discharge"); Rogers v. City County Health Dept. of Oklahoma County, 30 Fed.Appx. 883, 888 n.2 (10th Cir. 2002) (unpublished); Caridad v. Metro-North Commuter RR, 191 F.3d 283, 294 (2d Cir. 1999) (constructive discharge was not a tangible employment action warranting imposition of strict liability under Ellerth/Faragher standard); Montero v. AGCO Corp., 192 F.3d 856, 891 (9th Cir. 1999) (not deciding the issue of whether a constructive discharge can be a tangible employment action for the purpose of a Faragher analysis, because Plaintiff was not constructively discharged); . Dunegan v. City of Council Grove, Kansas Water Dept., 77 F.Supp.2d 1192, 1199-1200 (D.Kan.1999) (finding "no merit to plaintiff's suggestion that a constructive discharge falls within the definition of 'discharge' as set forth in Ellerth"); cmp., Bowman v. Shawnee State Univ., 220 F.3d 456, 462 n.6  (6th Cir. 2000) (assuming, without discussion, that constructive discharge was a tangible employment action) with Turner v. Dowbrands, Inc., 221 F.3d 1336 (unpublished opinion), 2000 WL 924599 (6th Cir.(Ohio)) (constructive discharge is not a tangible employment action for purposes of Faragher and Burlington); Wolf v. Northwest  Indiana Symphony Society, 250 F.3d

tangible employment action, I conclude that Plaintiff's claim of quid pro quo sexual harassment must fail because, as noted above, there is no evidence that Mansour had any supervisory authority with regard to Plaintiff, and Plaintiff's alleged constructive discharge was not the result of her response to a supervisor's sexual demands.  Accordingly, the Corporate Defendants are entitled to summary judgment with regard to Plaintiff's Title VII claim for quid pro quo sexual harassment.  Because the Court determined above that Corporate Defendants are entitled to summary judgment with regard to the only other theory of Plaintiff's Title VII claim, and because the Corporate Defendants are the only Defendants named in the Title VII claim, Plaintiff's Title VII claim in Count One will be dismissed.

I.     PLAINTIFF'S STATE LAW CLAIMS IN COUNTS TWO THROUGH SEVEN

This case was removed to federal court from a New Mexico state court on the basis of federal question jurisdiction.  See Notice of Removal (Doc. 1).  The only federal question raised in this case was Plaintiff's claim under Title VII in Count One of the Complaint.  Under 28 U.S.C. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction.  As noted above, the Court will dismiss Plaintiff's Title VII claim pursuant to Fed. R. Civ. P. 56 leaving only Plaintiff's state law claims in Count Two, Three, Four, Five, Six and Seven.  Since Plaintiff chose as her forum the Second Judicial District Court, I see no reason not to allow her to pursue her state law claims in state court.  Therefore, in accordance with 28 U.S.C. § 1367(c)(3), this Court declines to exercise

---

1136, 1142 (7th Cir. 2001) (noting that court had not yet determined whether a constructive discharge is a tangible employment action); but see Phillips v. Taco Bell Corp., 156 F.3d 884, 889 & n. 6 (8th Cir.1998) (allowing constructive discharge claim to proceed as tangible detrimental employment action provided that plaintiffs were able to generate a genuine issue of material fact that they were constructively discharged).

supplemental jurisdiction over Plaintiff's state law claims and, pursuant to 28 U.S.C. § 1441(c), will remand these claims to the state court from which they were removed.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Monarch Dental Corporation and Bright Now! Dental, Inc.'s Motion for Summary Judgment (Doc. 59) is hereby GRANTED IN PART in that judgment is granted in favor of Defendant Monarch Dental Corporation and Bright Now! Dental, Inc. on Plaintiff's Title VII claim in Count One of the Complaint.

IT IS FURTHER ORDERED that the Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims in Counts Two, Three, Four, Five, Six and Seven of Plaintiff's Complaint, and these claims are hereby REMANDED to the Second Judicial District Court, County of Bernalillo, State of New Mexico.[10]

UNITED STATES DISTRICT JUDGE

---

[10]Defendant Mansour filed a Motion for Summary Judgment with regard to the state law claims asserted against him (Doc. 57). Because the Court is remanding these claims to the state court, this Court will not rule on Defendant Mansour's motion.